[No. A094859. First Dist., Div. Four. Aug. 27, 2002.]

OAKLAND-ALAMEDA COUNTY COLISEUM AUTHORITY, Plaintiff and Appellant, v.
CC PARTNERS, Defendant and Appellant.

**COUNSEL**

Keker & Van Nest, John W. Keker, Jon B. Streeter, Steven A. Hirsch, Wendy J. Thurm and Michael S. Kwun for Plaintiff and Appellant.

Adamski Moroski, Steven J. Adamski, John E.D. Nicholson; Kerr & Wagstaffe and James A. Wagstaffe for Defendant and Appellant.

## OPINION

**KAY, P. J.**—CC Partners appeals from a judgment confirming an arbitration award. In its opening brief CC Partners contends: (1) It was required to arbitrate a claim expressly excluded from arbitration by the parties' arbitration agreement; (2) the arbitration agreement is so one-sided as to be unenforceable; and (3) assuming the arbitrator properly heard the claim, he committed errors of law that can be reviewed by this court under the terms of the arbitration agreement. In its reply brief (and in a supplemental brief requested by this court), CC Partners argues the provision in the arbitration agreement allowing judicial review of errors of law renders the arbitration agreement void and unenforceable, based on the recent decision in *Crowell v. Downey Community Hospital Foundation* (2002) 95 Cal.App.4th 730 [115 Cal.Rptr.2d 810] (*Crowell*).

We agree with the arbitrator that the parties' dispute fell within the scope of their arbitration agreement. Applying the primary holding in *Crowell*, we will not review the arbitrator's decision for errors of law. We conclude that the parties' arbitration agreement is valid and enforceable, except to the extent it provides for judicial review of errors of law. We affirm the judgment.

### BACKGROUND

The factual findings of the arbitrator are binding on this court. (See *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 11 [10 Cal.Rptr.2d 183, 832 P.2d 899] (*Moncharsh*).) We therefore take our background facts from the findings of the arbitrator and supplement them as necessary for a full understanding of the case with facts from evidence in the record. Many of the background facts are not disputed.

CC Partners does business as the Golden State Warriors, a professional basketball team. In July 1996, CC Partners entered into a "License Agreement" with respondent Oakland-Alameda County Coliseum Authority (Authority) and Oakland-Alameda County Coliseum, Inc. (County Coliseum, Inc.), in connection with the building of a new arena for Warriors home basketball games. The construction of the new arena, which was to be built within the shell of an existing arena in Oakland, was to be financed, in

part, through the issuance of bonds. The License Agreement required CC Partners to pay rent, share certain expenses, and contribute a portion of their revenue to retirement of construction debt.

At the same time CC Partners, the Authority and County Coliseum, Inc., entered into the License Agreement, they entered into separate agreements covering various other aspects of the relationship between the parties ("Arena Agreement," "Retention Agreement," and "Practice Facilities/ Office Agreement"). And approximately two weeks later, CC Partners and the Authority entered into an agreement ("Deposit Agreement") with Canadian Imperial Bank of Commerce (Bank) as part of the financing of the construction of the new arena.

The License Agreement contained a broad, detailed arbitration clause. The clause provided for arbitration of "[e]ach dispute, controversy, or claim arising out of or relating to this License Agreement or the relationship established pursuant to this License Agreement . . . ." Excepted from arbitration under this clause, however, were any disputes arising under the provisions of any other agreements to which the Authority, County Coliseum, Inc., and CC Partners were parties (e.g., the Arena Agreement).[1]

After the new arena was built, the Warriors played their first game there on November 8, 1997. By December 1998, the Authority was demanding arbitration to resolve various disputes between it and CC Partners. This appeal concerns only their dispute over CC Partners' obligation to pay "Premium Seating Revenues" to the Authority.

Pursuant to the License Agreement, CC Partners agreed to pay up to $7,428,000 of premium seating revenues per year toward the debt incurred for the construction of the new arena and related facilities. Payment of the premium seating revenues was to commence on the first day of the "Term." The License Agreement defined "Term" as the "Initial Term" together with

---

[1] Paragraph 39.1 of the License Agreement states: "General. Each dispute, controversy, or claim arising out of or relating to this License Agreement or the relationship established pursuant to this License Agreement including, without limitation, any dispute, controversy or claim arising out of or relating to (a) a party's alleged default under this License Agreement, (b) the parties' failure to mutually agree as required or contemplated by this License Agreement (a 'Failure to Agree'), or (c) damages or equitable remedies or relief to which any party may be entitled under this License Agreement shall be settled by final and binding arbitration conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the 'AAA'), which shall apply except as modified below. Except as specifically provided in any other agreement(s) to which [County Coliseum, Inc.], Authority and [CC Partners] are parties, no party shall be obligated to submit to arbitration any disputes arising under the provisions of such other agreements."

any extensions. The License Agreement states the initial term "shall commence upon the later of (i) delivery by [County Coliseum, Inc.] of the New Arena Ready for Occupancy, and (ii) the beginning of the 1997-1998 Regular Season; . . . ." "Ready for Occupancy" meant "Substantial Completion" as defined in the Arena Agreement.

The Deposit Agreement contained additional provisions regarding payment of premium seating revenues. Referring to the pertinent sections of the License Agreement, the Deposit Agreement stated the "Warriors" had agreed to modify the timing of the payment of its obligation under the License Agreement to pay premium seating revenues. The Deposit Agreement provided: "With respect to the first year of the License Agreement, the Warriors shall pay to the Authority by the later of November 1 or the date of the first Home Game one hundred percent (100%) of the amount of Estimated Debt Service or, if less, one hundred percent (100%) of the Premium Seating Revenues received by the Warriors for such year."

Notwithstanding the fact that the Warriors moved into the new arena and began playing games there, CC Partners refused to pay the Authority any premium seating revenues. CC Partners asserted the term of the License Agreement had not begun; substantial completion had not occurred.

The arbitrator framed the issue as follows: "When does the obligation of the Warriors to pay Premium Seating Revenue begin?" The arbitrator initially concluded the License Agreement and the Deposit Agreement appeared to differ on when payment of premium seating revenues was triggered. Payment under the License Agreement was tied to substantial completion of the new arena, while the Deposit Agreement provided fixed dates for payment.

The arbitrator heard testimony from a number of witnesses in order "to clarify the parties' intentions in entering into these Agreements." CC Partners, however, objected to the arbitration of any claims involving the Deposit Agreement. CC Partners argued there was no arbitration clause in the Deposit Agreement,[2] and the arbitration clause in the License Agreement specifically excluded arbitration of claims arising under the provisions of other agreements.

Based on the language of the License and Deposit Agreements and the testimony received, the arbitrator found the dispute over premium seating

---

[2] The Deposit Agreement, however, did contain a provision that referred to arbitration: "Notwithstanding anything to the contrary contained in the License Agreement, the Bank shall not be obligated to submit any disputes hereunder to arbitration nor shall the Bank be otherwise limited in its remedies and right to pursue damages against the Warriors, including, without limitation, consequential damages."

revenues arose under the License Agreement; therefore, the arbitration clause of that Agreement governed the dispute. The arbitrator noted the License Agreement and Deposit Agreement were uniquely related and dependent on each other and covered the same subject matter: "The Deposit Agreement would have no meaning apart from the License Agreement." The arbitrator also found the provision in the Deposit Agreement exempting the Bank from arbitration would make no sense unless it was read in conjunction with the License Agreement.

After disposing of CC Partners' objections to the arbitration, the arbitrator decided the Deposit Agreement modified the trigger for payment of premium seating revenues under the License Agreement. Premium seating revenues therefore became due the date of the first home game, November 8, 1997.

After the arbitrator resolved all of the issues raised by the parties and CC Partners stipulated to the amounts it owed under the arbitrator's decisions, CC Partners filed a petition in the superior court to vacate in part and confirm in part the arbitration award. The Authority in turn sought to confirm the arbitration award.

The trial court confirmed the award, specifically finding that the arbitrator acted within his authority in resolving all disputes between the parties, including the dispute over premium seating revenues. At the time the court signed the judgment, CC Partners owed over $17 million in premium seating revenues, including interest.

DISCUSSION

A.  *Scope of Arbitration*

■   CC Partners contends the arbitration award must be vacated because the arbitrator exceeded his powers by arbitrating a claim arising under the Deposit Agreement.

An arbitration award shall be vacated if the arbitrator exceeded his or her power, and the award cannot be corrected without affecting the merits of the decision. (Code Civ. Proc., § 1286.2, subd. (a)(4).)

■   We review the trial court's decision concerning whether an arbitrator exceeded his powers de novo, but we give substantial deference to the arbitrator's own assessment of his contractual authority. (*Alexander v. Blue Cross of California* (2001) 88 Cal.App.4th 1082, 1087 [106 Cal.Rptr.2d

431].) Any doubts as to the meaning or extent of an arbitration agreement are for the arbitrator, not the court to resolve. (*Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 372 [36 Cal.Rptr.2d 581, 885 P.2d 994].) "Although [Code of Civil Procedure] section 1286.2 permits the court to vacate an award that exceeds the arbitrator's powers, the deference due an arbitrator's decision on the merits of the controversy requires a court to refrain from substituting its judgment for the arbitrator's in determining the contractual scope of those powers." (*Ibid.*)

The deference due an arbitrator's decision is compounded in this case by the fact that the arbitrator determined the question of arbitrability based, in part, on testimony presented by the parties. (See *Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 913 [75 Cal.Rptr.2d 573] [an appellate court will uphold any reasonable construction of a contract where interpretation of the contract turns upon the credibility of conflicting extrinsic evidence].) Though CC Partners claims there were no disputed facts on the question of arbitrability, the testimony presented to the arbitrator is not in the record before this court. Therefore, we are unable to confirm CC Partners' claim. CC Partners also refers to evidence it submitted to the trial court, but that evidence is irrelevant as it is not evidence the arbitrator relied upon. There is no such thing as a de novo trial of the jurisdictional facts found by the arbitrator. (See *Van Tassel v. Superior Court* (1974) 12 Cal.3d 624, 627 [116 Cal.Rptr. 505, 526 P.2d 969].)

In any event, even if we were to limit our review to the terms of the License and Deposit Agreements, we would still agree with the arbitrator's interpretation of the parties' arbitration agreement. The testimony cited by the arbitrator only reinforces our conclusion. The arbitration clause of the License Agreement is very broad, requiring arbitration not only of disputes arising out of the License Agreement, but also disputes "relating" to the License Agreement or the relationship established pursuant to the License Agreement. The obligation to pay premium seating revenues arises out of the License Agreement. The matter arbitrated was a dispute over the payment of premium seating revenues. It follows that the dispute arose out of the License Agreement, and was related to the License Agreement and the relationship established pursuant to the License Agreement. There would be no dispute but for the License Agreement.

Further, as the arbitrator found, the Deposit Agreement itself was related to the License Agreement. The Deposit Agreement served no purpose, indeed it would not exist, but for the existence of the License Agreement, and more specifically, the existence of CC Partners' obligation to pay

premium seating revenues toward retirement of the debt. Both the provisions of the Deposit Agreement and the factual findings of the arbitrator show the intent of the parties was to modify and "speed up" the timing of the payment of the premium seating revenues. The arbitrator's decision notes the witnesses explained the Deposit Agreement was necessary to complete the financing of the new arena because the Bank wanted "exact dates" for payment.

CC Partners relies on the "Carve-Out" provision of the arbitration clause, which barred arbitration of any dispute arising under the provisions of "any other agreement(s)" among CC Partners, the Authority and County Coliseum, Inc. But the parties to the Deposit Agreement were CC Partners, the Authority and the Bank. By definition the Deposit Agreement did not fall within the scope of the carve-out. More importantly, the dispute did not arise under the Deposit Agreement. As explained above, it arose under the License Agreement.

The same response applies to CC Partners' concern that the Deposit Agreement does not contain an arbitration clause: The dispute arose under the License Agreement, not the Deposit Agreement. Further, as the arbitrator pointed out, it is significant that a clause in the Deposit Agreement excluded the Bank from having to arbitrate any dispute. That provision makes no sense unless read in conjunction with the arbitration clause of the License Agreement. Apparently the Bank thought the License Agreement would require arbitration of any dispute with CC Partners or the Authority absent language to the contrary in the Deposit Agreement.

CC Partners argues the Deposit Agreement cannot modify the License Agreement because the latter agreement contained a provision that prohibited modifications absent an instrument executed by all parties with the same formality as the License Agreement. But this argument has nothing to do with the scope of the arbitration; instead it goes to the merits of the dispute, which in turn is beyond the scope of our review (see pt. C, *post*).

Finally, CC Partners claims the Authority should be estopped from arbitrating a dispute arising under the Deposit Agreement, because the Authority relied on the carve-out provision during the arbitration. But the Authority argued only that a dispute arising under the Arena Agreement was not subject to arbitration. Disputes arising under that Arena Agreement are not subject to arbitration; CC Partners does not argue otherwise. Therefore, the Authority can hardly be faulted for properly invoking the carve-out provision when it applied.

■ As this court has noted in the past, arbitration agreements should be liberally interpreted and arbitration should be ordered unless an agreement clearly does not apply to the dispute in question. (*Vianna v. Doctors' Management Co.* (1994) 27 Cal.App.4th 1186, 1189 [33 Cal.Rptr.2d 188].) As the arbitrator found, the dispute over payment of premium seating revenues was subject to arbitration.

### B. *Unconscionable Arbitration Agreement*

■ CC Partners contends "arbitration of the Deposit Agreement is also so one-sided as to be unenforceable." CC Partners points to the fact that the Bank does not have to arbitrate.

The arbitration agreement binds CC Partners, the Authority and County Coliseum, Inc., to arbitrate certain disputes. It is mutual in every respect among CC Partners, the Authority and County Coliseum, Inc. The Bank is not a party to the arbitration agreement. Its obligation to arbitrate or the lack thereof is not before this court, but it would appear CC Partners and the Bank stand as equals with respect to one another—neither can force the other to arbitrate.

CC Partners' reference to cases in which arbitration clauses contained unconscionable terms misses the mark. (See *Kinney v. United HealthCare Services, Inc.* (1999) 70 Cal.App.4th 1322 [83 Cal.Rptr.2d 348] [arbitration provision in employee handbook]; *Saika v. Gold* (1996) 49 Cal.App.4th 1074 [56 Cal.Rptr.2d 922] [arbitration agreement between doctor and patient].) The arbitration agreement here does not meet any of the tests for finding unconscionability. (See *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 113 [99 Cal.Rptr.2d 745, 6 P.3d 669].) The instant arbitration agreement does not appear in a contract of adhesion, and CC Partners was not an unsophisticated party with inferior bargaining power.

CC Partners' contention that the arbitration agreement was one-sided has no merit.

### C. *Review of the Arbitrator's Legal Findings*

■ In its opening brief, CC Partners argues it is entitled to a "full review of all legal issues." The basis for this request is a provision in the arbitration agreement that permits any party to request a de novo review of

questions of law.[3] In its reply brief, however, CC Partners reverses course. Citing *Crowell, supra,* 95 Cal.App.4th 730, a recent decision from the Second District Court of Appeal, CC Partners claims the arbitration agreement is invalid because it expands judicial review of the arbitration award beyond that permitted by the Code of Civil Procedure.

Given that *Crowell* was decided after the Authority filed its brief in this matter, we requested supplemental briefing from both the Authority and CC Partners. In its supplemental brief and again at oral argument, CC Partners insisted that not only is the parties' arbitration agreement void, but that this court has no jurisdiction in this matter.

We think CC Partners reads too much into *Crowell.*

■   It has long been the rule that an arbitrator's decision cannot be reviewed for errors of fact or law. (*Moncharsh, supra,* 3 Cal.4th at p. 11.) Judicial review of private arbitration is limited to those grounds for review provided by sections 1286.2 and 1286.6 of the Code of Civil Procedure. (*Moncharsh,* at pp. 26, 33.) In *Crowell,* however, the arbitration agreement permitted a court to vacate an arbitrator's award if it was not supported by substantial evidence or if it was based on an error of law. (*Crowell, supra,* 95 Cal.App.4th at p. 733, fn. 2.) The primary holding in *Crowell* was that the parties to an arbitration agreement cannot contractually expand the scope of judicial review beyond that provided by statute: "Because the Legislature clearly set forth the trial court's jurisdiction to review arbitration awards when it specified grounds for vacating or correcting awards in sections 1286.2 and 1286.6, we hold that the parties cannot *expand* that jurisdiction by contract to include a review on the merits." (*Id.* at p. 739, italics added.) Finding the invalid judicial review provision was central to and unseverable from the arbitration agreement, the *Crowell* court concluded the entire agreement was void and unenforceable. (*Id.* at pp. 739-740.)

■   We agree with the primary holding in *Crowell.* We do not have the power to review de novo any questions of law decided by the arbitrator. That does not mean, however, that we necessarily follow *Crowell* and find the parties' arbitration agreement void and unenforceable.

The *Crowell* court was not reviewing a judgment confirming an arbitration award. It was reviewing the sustaining of a demurrer to a complaint, filed

---

[3]Paragraph 39.3.11 of the License Agreement provides: "The decision of the arbitrator shall be final and binding upon the parties without appeal or review except as permitted by California law, . . . provided, however, that either party may file an application to correct or vacate the arbitration award or an application for de novo review on all questions of law based on the arbitrator's finding of fact (which are deemed for such purpose to be stipulated by the parties), in either case under California Code of Civil Procedure Section 1285 *et seq.* . . ."

prior to arbitration, seeking declaratory relief. Here, the arbitration has been completed and the Authority is seeking to confirm the arbitration award. An improper attempt to expand the scope of judicial review is not among the statutory grounds for vacating an arbitration award. (See Code Civ. Proc., § 1286.2.)

The *Crowell* court also did not have to consider a severance clause.[4] Here, in contrast, the License Agreement contains a broad severance clause: "If any provision of this License Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this License Agreement and the application of such provision to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law."

The unmistakable intent of this language is that all provisions of the License Agreement, including the arbitration agreement, are to be enforced except to the extent they are invalid. CC Partners, however, suggests that we remand this matter to the trial court for an evidentiary hearing on severability. We decline to do so.

First, we see no ambiguity in the language of the severance clause. It plainly provides that the remainder of the parties' agreement will not be affected by any invalid provisions. Though California law permits the use of extrinsic evidence to explain the meaning of a written instrument (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]), CC Partners fails to point to any ambiguity in the severance clause and it does not suggest how the language could have a different meaning. It has made no offer of proof as to what evidence it would introduce to reveal an ambiguity or suggest a different meaning.

Second, the principles of equity underlie the enforcement of arbitration agreements. (*Saika v. Gold, supra,* 49 Cal.App.4th at p. 1081.) Equity also informs the decision as to whether to sever an illegal term of a contract. In *Armendariz v. Foundation Health Psychcare Services, Inc., supra,* 24 Cal.4th at page 123, the California Supreme Court set forth two reasons for severing illegal terms rather than voiding an entire contract: "The first is to prevent parties from gaining undeserved benefit or suffering undeserved detriment as a result of voiding the entire agreement—particularly when there has been full or partial performance of the contract. [Citations.]

---

[4]At the request of the Authority, we have taken judicial notice of the pleadings in *Crowell,* which incorporated the parties' agreement. That agreement contains no severance provision.

Second, more generally, the doctrine of severance attempts to conserve a contractual relationship if to do so would not be condoning an illegal scheme. [Citations.] The overarching inquiry is whether ' "the interests of justice . . . would be furthered" ' by severance." (*Id.* at pp. 123-124; see *Beynon v. Garden Grove Medical Group* (1980) 100 Cal.App.3d 698, 713-714 [161 Cal.Rptr. 146] [provision in arbitration agreement void as against public policy severed from agreement and arbitration award confirmed]; *Saika v. Gold, supra,* 49 Cal.App.4th at pp. 1081-1082 [provision in arbitration agreement contravenes public policy and will not be enforced; case remanded with directions to confirm arbitration award].)

Here, CC Partners would gain an undeserved benefit if we were to find the whole of the parties' arbitration agreement invalid when the arbitration itself suffered from no infirmity.[5] Further, we would be ignoring the parties' intent that the remainder of their agreement "shall not be affected" by the invalidity of any particular provision. The interests of justice and the policy of this state to encourage the arbitration of disputes would be ill served by a ruling that would render this arbitration award unenforceable. We therefore sever the offending provision from the arbitration agreement and enforce the remainder of the agreement, as the parties contracted, "to the greatest extent permitted by law."

D. *Cross-appeal*

The Authority has filed a "protective" cross-appeal. The Authority seeks review of certain issues only if this court were to reverse the judgment on any of the grounds urged by CC Partners. As we affirm the judgment, it is unnecessary to consider the issues raised in the Authority's cross-appeal.

---

[5]We also have some reservations regarding the belated nature of CC Partners' attack on the entire arbitration process. On the one hand, CC Partners defends this delay arguing that, prior to *Crowell* (which was decided during the parties' briefing on this appeal) "no one had anticipated that parties to arbitration clauses lacked the power to expand the reviewing power of the California courts . . . ." On the other hand, in defending *Crowell* on the merits, CC Partners not only concedes but affirmatively contends that Crowell was not an aberration: "*Crowell* continues in a long line of case authority that prevents contracting parties from creating 'the mythical chimera, out of incongruous parts' in their arbitration agreements. *Old Republic Ins. Co. v. St. Paul Fire & Marine Ins. Co.,* 45 Cal.App.4th 631, 639 [53 Cal.Rptr.2d 50] (1996) (refusing direct appellate review of arbitration award). *Old Republic* is but one example of California courts refusing to permit the parties to borrow some, but not all, of their procedures and jurisdiction in their arbitration agreements. . . . *National Union Fire Ins. Co. v. Nationwide Ins. Co.,* 69 Cal.App.4th 709, 716 [82 Cal.Rptr.2d 16] (1999)." *Crowell* itself noted that this issue has arisen in various federal courts, resulting in a split of authority among the circuit courts. (See *Crowell, supra,* 95 Cal.App.4th at pp. 738-739, and cases cited therein.) Arguably, if CC Partners believed the arbitration clause was void, it should have made the argument before now. (See *Moncharsh, supra,* 3 Cal.4th at p. 31 [claim that arbitration agreement is illegal must be raised prior to participating in the arbitration].)

## DISPOSITION

The judgment is affirmed. The cross-appeal is dismissed as moot. The Authority shall recover its costs on appeal.

Reardon, J., and Rivera, J., concurred.

The petition of appellant CC Partners for review by the Supreme Court was denied November 20, 2002. Werdegar, J., did not participate therein Chin, J., was of the opinion that the petition should be granted.