[No. B200141. Second Dist., Div. One. May 28, 2008.]

CALIFORNIA SCHOOL EMPLOYEES ASSOCIATION et al., Plaintiffs and Respondents, v.
BONITA UNIFIED SCHOOL DISTRICT et al., Defendants and Appellants.

388

COUNSEL

Breon & Shaeffer, Keith V. Breon and George W. Shaeffer, Jr., for Defendants and Appellants.

Michael R. Clancy and Christina C. Bleuler for Plaintiffs and Respondents.

OPINION

**MALLANO, Acting P. J.**—For decades, the Education Code did not permit classified employees of public school districts to submit disciplinary disputes to binding arbitration. Rather, the district's governing board had broad and sole authority to make disciplinary decisions. In 2001, the Legislature addressed the subject. The result was a statute—not yet construed by the courts—that allows classified employees to arbitrate certain disciplinary matters (Ed. Code, § 45113, subd. (e) (section 45113(e)).

Here, a school district summarily terminated a classified employee, declining to apply the progressive disciplinary steps set forth in the parties' collective bargaining agreement (CBA). Under the CBA, progressive discipline was mandatory unless the employee's wrongdoing was sufficiently "serious." The discharged employee and the union submitted to arbitration the question of whether the employee's wrongdoing was so serious as to excuse the use of progressive discipline. The arbitrator found in the employee's favor and ordered his reinstatement with backpay and benefits.

The 2001 statute authorizes the district's governing board to review an arbitration award under the standards imposed by the California Arbitration Act (Arbitration Act; Code Civ. Proc., § 1286.2). (See Ed. Code, § 45113(e).) In this case, the governing board reviewed the evidence presented at the arbitration hearing, disagreed with the arbitrator's definition of "serious," and issued its own decision, "vacating" the arbitration award and upholding the employee's termination.

The employee and the union turned to the trial court for relief, filing a petition to confirm the arbitration award and to obtain a writ of mandate directing the governing board to reverse its decision and comply with the remedial portion of the award. The trial court granted the petition in its entirety.

We conclude that the arbitration award was "final and binding" in accordance with the terms of the CBA. Further, because none of the statutorily permitted grounds for vacating the award applied (see Code Civ. Proc., § 1286.2), the governing board erred in "vacating" it. Even assuming that the arbitrator made an error of fact or law, the award cannot be set aside on that basis. Thus, the trial court properly confirmed the award and issued the writ of mandate.

# I

## BACKGROUND

Since 1995, Donald Roberts has been employed by the Bonita Unified School District (District). He began his employment as a maintenance mechanic and, in 2001, became a lead maintenance mechanic in the District's facilities department. Roberts, a classified employee, was represented by the union, the California School Employees Association, Bonita Chapter No. 21 (CSEA). The District's classified positions include certain jobs in the clerical, fiscal, maintenance, operations, food services, and transportation areas. Classified employees are typically distinguished from certificated employees, who require a teaching certificate. (See Ed. Code, §§ 44006, 45103, subd. (a), 45104.)

On June 3, 2004, the District's superintendent sent Roberts a "Notice of Termination and Suspension Without Pay," specifying nine "causes" and 24 "reasons" for suspending and discharging him. (See Ed. Code, § 45116.) The "causes" included incompetence, dishonesty, insubordination, immoral conduct, evident unfitness for service, absent without authority, and violation of

school laws. Among the "reasons" were (1) communicating regularly with staff members in rude, abusive, sexually explicit, and threatening language; (2) creating a sexually hostile work environment for two female employees; (3) refusing to do assigned duties; (4) failing to comply with supervisors' directions; (5) permitting a subordinate to damage District equipment and to harass other maintenance department employees; (6) taking District property home for personal use; (7) destroying District property; (8) intimidating employees of the maintenance department on a regular basis; and (9) exposing the District to liability under state and federal antidiscrimination laws. The letter informed Roberts that he would be suspended without pay effective upon the close of business on June 15, 2004, explaining that "during the pendency of dismissal proceedings, you present an unreasonable risk of harm to District staff and District property."

Roberts challenged the discipline through two methods. First, he requested a traditional hearing, authorized by statute, before the governing board. (See Ed. Code, § 45113, subd. (c) (section 45113(c)) [providing for hearing on disciplinary charges at option of employee].) The proceeding would be conducted by a hearing officer appointed by the governing board. (See Dist. Admin. Regs., § 3.c.(1).) The governing board would ultimately render a decision. (See *id.*, § 3.c.(7).)

Second, under the CBA and the statute enacted in 2001 (Ed. Code, § 45113(e)), Roberts and the CSEA filed a grievance—"a claim . . . that there exists an alleged violation, misinterpretation, or misapplication of the specific provision(s) of this Agreement." (CBA, § 9.8.1.) A grievance, if not informally resolved by the parties, is decided by an arbitrator, whose award is—as stated in section 9.9.4.4 of the CBA—"final and binding." The CBA also provided: "The arbitrator shall have no power to alter, amend, change, add to, or subtract from any of the terms of this Agreement [and] shall therefore not have the authority . . . to interpret or apply the Agreement so as to change what can fairly be said to have been the intent of the parties as determined by generally accepted rules for contract construction." (CBA, § 9.9.4.3.) Further, "[p]ast practice of the parties in interpreting or applying terms of this Agreement may be relevant evidence . . . ." (CBA, § 9.9.4.3.)

Under section 26.1.1 of the CBA, the District was required to use "progressive discipline"—verbal counseling, verbal warning, written warning, and letter of reprimand—which "shall not be bypassed unless the serious nature of the offense warrants [it]." That section continued: "Whether or not the nature of the offense was so serious as to require bypassing progressive discipline steps may be submitted to arbitration." Under section 26.3 of the CBA, "[a]ctions for cause beyond a letter of reprimand including . . . suspension and termination will be conducted in accordance with [certain sections of the] Education Code."

To streamline the decisionmaking process, the parties agreed to conduct the *board hearing* and the *arbitration* in a consolidated proceeding before a third party, Richard W. Calister, Esq., a labor disputes arbitrator. As memorialized in an August 4, 2004 letter from the District to the CSEA: "We agree that under the CBA, if Mr. Calister determines that the nature of the offenses against Mr. Roberts [is] not so serious as to require bypassing progressive discipline steps, the termination decision cannot stand. . . . [¶] We agree that under the CBA, Mr. Calister's decision on whether progressive discipline can be bypassed will be binding on the parties and the [Governing] Board in accordance with [the CBA]. [¶] However, once Mr. Calister determines that the charges are sufficiently serious as to require bypassing progressive discipline steps, the matter is now covered by [the] Education Code . . . . Mr. Calister now becomes the Board's hearing officer, and the balance of the hearing is not covered either by the rules of arbitration, or the District's grievance procedure. [¶] The Board is empowered [by law] to accept, reject or modify the findings and conclusions of the hearing officer."

Mr. Calister conducted a 25-day evidentiary hearing on nonconsecutive days from September 22, 2004, to March 15, 2006. On July 14, 2006, he issued a 16-page award, concluding in part that "[t]he nature of the offense[s by Roberts was] not so serious as to require bypassing progressive discipline steps and in doing so the District violated Section 26.1.1 of the [CBA]." Mr. Calister also found that "the only appropriate remedy is to effect the reinstatement of Roberts to his former employment . . . with . . . back pay and benefits less interim earnings, if any."

As more fully explained in the arbitration award: "While it is clear that [Superintendent Robert C.] Otto based his disciplinary determination upon his belief that Roberts' work performance—including interactions with supervisors and co-workers was markedly deficient and had been so for a considerable period of time—there is no evidence that these were directly and properly addressed with Roberts prior to Otto making his determination that Roberts' employment should be summarily suspended and terminated. A careful review of the documentary evidence Otto reviewed, weighed in light of the direct sworn testimony during this Hearing of those making the allegations and Roberts, does not support Otto's conclusion that Roberts' continued presence at work presented an unreasonable risk of harm to either District employees or its property so as to justify bypassing progressive discipline. The discipline imposed upon Roberts simply does not comport with the mandates the District was under to utilize progressive and corrective discipline prior to imposing those disciplines."

In discussing the requirement of progressive discipline and the exception for "serious" offenses, Mr. Calister stated: "What the [CBA] contemplates as necessary to excuse the application of progressive discipline are some act or acts by an employee that are so outrageous and egregious as to either have required no prior warning that severe discipline would occur—such as an employee's unprovoked forceful striking of a co-worker or supervisor, stealing District property—or some similar outrageous conduct that any employee would or reasonably should know was not only prohibited, but would likely result in summary suspension and termination of their employment. The only alleged misbehavior of Roberts that approaches this level of severity is associated with complaints by employees that they were legitimately fearful to be at work with him; no employee should be required to work under conditions which are inherently unsafe and which pose an unreasonable risk to their health or safety. While unquestionably a number of employees presented Otto with information expressing fear that Roberts posed such a threat, a fair review of the evidence presented at this Hearing in support of those allegations does not support a conclusion that the level of fear and apprehension expressed by them was reasonable and required that Roberts be removed from District employment without the prior application of progressive discipline."

The arbitration award addressed the issue of credibility as follows: "The totality of testimony supports a conclusion that, at most, many employees found Roberts to be unpleasant in his interactions with them, but none gave evidence that he behaved in a physically threatening manner towards them or uttered words which would reasonably lead them to conclude that his continued presence at work would be a legitimate threat to them. Indeed, the major complaint related to their 'fear' of Roberts was the fact that he would have 'that look,' unnecessarily glare at them which, coupled with their knowledge that he is a former United States Marine and their belief that he maintained a collection of firearms, lead them to unreasonably conclude that Roberts was literally ready to explode with violence against them. While Roberts never denied his previous military service, he credibly denied and refuted any suggestion that he even made known whether he maintained firearms at his residence and there is absolutely no evidence that at any time Roberts threatened any employee with violence of any kind, much less by use of firearms. While there was apparently a belief that Roberts may have brought firearms to work in his vehicle, that again was unproven supposition, a rumor apparently believed by some employees, furthering their unsupportable conclusion that Roberts' presence at work was a threat to their safety and created a 'hostile work environment' which could only be cured by permanently removing Roberts from the workplace. To be fair to Otto, he in

significant part premised his determination that it was necessary to bypass progressive discipline and summarily terminate Roberts' employment upon the investigative summary reports he received which gave no assessment of the credibility of what was being reported. But at this Hearing, the credibility of those employees and Roberts was clearly before me for determination."

Writing candidly, Mr. Calister said: "While I readily acknowledge that I have no divining rod capable of separating truth from fabrication, I find a striking lack of credible evidence that Roberts posed so serious a threat to the well-being of other employees as to warrant his summary suspension and discharge without the prior application of progressive and corrective discipline. If, assuming employees were legitimately concerned about Roberts glaring/staring at them, at the very least it was incumbent upon the District to make Roberts aware that employees were apprehensive or fearful and thus provide Roberts with an opportunity to self-correct which is at the very heart of the notion of progressive and corrective discipline which sanctions severe discipline only after an employee has been amply forewarned of the perceived misconduct and cautioned that unless it is corrected, discipline up to and including termination of employment will occur."

The award continued: "The other concerns Otto had with Roberts' work performance—ranging from a serious lack of cooperation with supervision, failing to accomplish assigned work in a timely and correct manner, work performance inefficiencies including failure to properly coordinate the work of those assigned to him, to concerns that Roberts engaged in use of abrasive, profane language and was demeaning in his remarks towards co-workers and supervision—while plainly serious if true, all are of the kind and type that require the application of progressive and corrective discipline and do not, individually or collectively amount to behavior so egregious as to justify bypassing the [CBA's] mandate to apply progressive discipline. Indeed, as to this litany of concerns which the District believes warrants discipline of Roberts, it is striking that the Record of this Hearing contains no evidence that those deficiencies were brought to Roberts' attention in a timely manner and/or that he was warned and admonished that unless they ceased [and he] improved, that he was crafting a path that would lead to his being disciplined, up to and including termination of his employment."

In his analysis, Mr. Calister relied in part on the *District's* failure to treat Roberts's alleged wrongdoing as serious, explaining: "The District alleged that Roberts' work activities and interactions involved his 'regularly' communicating with co-workers, supervision and others using 'rude, obscene, vulgar, profane, sexually explicit and threatening language' . . . . Frankly, the Record

of this Hearing is replete with the use of these kinds of remarks and dialogues by and among most of the male workers in the Department and they occurred in locations and under circumstances where Department management and supervision could not have been unaware it was occurring, but they did literally <u>nothing</u> to ensure that it stopped even when employees genuinely offended by it reported incidents to them. Rampant inappropriate verbal 'bantering' of these types were literally a daily event among Roberts' co-workers with Department supervision apparently regarding it as a type of harmless idle chatter and teasing which was not inappropriate among an all-male maintenance workforce which, to its credit (if 'credit' can ever be properly used in describing the use of such insults), apparently took care not to engage in while females, students or outside vendors were in the immediate area. Management's condoning of such behavior and then attempting to single out Roberts for discipline for doing the same thing would be the height of impermissible disparate discipline. What emerges from a fair review of all evidence regarding the use of inappropriate, insulting and profane sexually charged language and behaviors was that the practice was rampant in the maintenance workforce and workplace, and Roberts may not be fairly focused upon or disciplined for alleged participation in those behaviors."

The arbitration award then went into specifics: " 'Pranks' such as letting the air out of vehicle tires, placing and leaving rotting fish remains in vehicle interiors, spreading grease or other view-obstructing material on vehicle windshields and interior surfaces, sealing vehicle locks with glues, causing toilets to overflow while employees were seated on them, wrapping a vehicle with wire and chasing after co-workers attempting to pull down their pants, making and posting drawings and computer-generated and sexually insulting posters (including at least one of Roberts) were some of the childish 'pranks' which regularly were allowed to occur among Roberts' co-workers with either the full knowledge of, if not participation in, by some who supervised Roberts, or their negligent failure to be aware of these occurrences. While it is not for this Hearing Officer to lecture, if indeed responsible District management truly believes that such verbal and physical behaviors are not only wrong of themselves but dysfunctional to an effective workforce, then it needs to direct that a concerted and consistent effort be made to ensure employees that engaging in such activities is not only prohibited, but that to do so will lead to the application of progressive discipline which could result in loss of employment. Suffice to say with respect to Roberts, it would be entirely inappropriate to discipline him in any fashion based upon allegations of such misconduct by him."

The members of the governing board individually reviewed the arbitration award as well as the testimony and exhibits presented at the arbitration. On

September 14, 2006, the board issued its own decision. It found that the arbitrator had "exceeded his powers" by improperly defining "serious nature of the offense." (See Code Civ. Proc., § 1286.2, subd. (a)(4).) Relying on definitions from a dictionary, the board stated that the arbitrator had imposed "his own personal definition" of "serious" on the parties by equating "serious offense" with "criminal act." The board expressly disagreed with that interpretation, concluding that Roberts's conduct was sufficiently serious to bypass progressive discipline. Invoking its statutory authority (Ed. Code, § 45113(e)), the board "vacated" the arbitration award. The board decided that Roberts had been properly suspended and terminated.

On December 21, 2006, the CSEA and Roberts filed a verified petition in the trial court to confirm the arbitration award and to obtain a writ of mandate directing the District, board, and superintendent (collectively board) to reverse the board's decision and provide the remedies set forth in the arbitration award. The board filed a verified answer.

Subsequently, the CSEA and Roberts filed points and authorities in support of their petition. The board filed papers in opposition. The administrative record was lodged.

The matter came on for hearing on May 1, 2007, and was taken under submission. On May 3, 2007, the trial court issued a statement of decision, confirming the arbitration award. On June 13, 2007, the trial court issued a writ of mandate directing the board to reverse its decision and to reinstate Roberts with backpay and benefits. On the same day, the trial court filed a judgment, incorporating its statement of decision, granting the petition to confirm the arbitration award, and ordering the issuance of the writ. The board appealed.

## II

## DISCUSSION

Because this appeal involves the application of statutes to undisputed facts, we independently review the trial court's decision. (See *Emeryville Redevelopment Agency v. Harcros Pigments, Inc.* (2002) 101 Cal.App.4th 1083, 1095 [125 Cal.Rptr.2d 12].)

The board argues it was empowered by law to review the arbitration award under section 1286.2 of the Code of Civil Procedure, and the arbitrator exceeded his powers by concluding that Roberts's wrongdoing was not

sufficiently "serious" to bypass progressive discipline. In determining and applying its standard of review—which it describes as "not unfettered and not de novo"—the board did not treat the arbitration award as final and binding, believing that the "final and binding" provision in the CBA was invalid under statutory and case law. This led to a board decision that failed to accord proper deference to the arbitration award.

We agree that the board had the authority to review the arbitration award but do not agree that the "final and binding" provision is invalid or that the arbitrator exceeded his powers in defining "serious." The board offered no legitimate grounds for vacatur, and the trial court properly confirmed the award.

A.   *Grounds to Vacate an Arbitration Award*

The resolution of this appeal begins with an analysis of Education Code section 45113, which provides in pertinent part: "(a) The governing board of a school district shall prescribe written rules and regulations, governing the personnel management of the classified service . . . .

"(b) Any employee designated as a permanent employee shall be subject to disciplinary action only for cause as prescribed by rule or regulation of the governing board, but the governing board's *determination of the sufficiency of the cause for disciplinary action* shall be conclusive.

"(c) The governing board shall adopt rules of procedure for disciplinary proceedings which shall contain a provision for informing the employee by written notice of the specific charges against him or her, a statement of the employee's right to a hearing on those charges, and the time within which the hearing may be requested . . . . [¶] . . . [¶]

"(e) Nothing in this section shall be construed to prohibit the governing board, pursuant to the terms of an agreement with an employee organization under Chapter 10.7 (commencing with Section 3540) of Division 4 of Title 1 of the Government Code, from *delegating its authority to determine whether sufficient cause exists for disciplinary action* against classified employees, excluding peace officers as defined in Section 830.32 of the Penal Code, *to an impartial third party hearing officer.* However, the *governing board shall retain authority to review the determination under the standards set forth in Section 1286.2 of the Code of Civil Procedure.*" (Italics added.)

■   As stated, Roberts requested a hearing before the governing board on his suspension and termination. That type of hearing is governed by the regulations promulgated by the board. (See Dist. Admin. Regs., § 3; Ed. Code,

§ 45113(c).) The governing board appoints a hearing officer who, after the presentation of evidence, issues a recommended decision. (See Dist. Admin. Regs., § 3.c.(7).) The board has the option of approving the hearing officer's recommendation or making its own findings and conclusions. (See *ibid.*) Either way, the governing board's decision is, by statute, "conclusive." (Ed. Code, § 45113, subd. (b) (section 45113(b)); see *United Steelworkers of America v. Board of Education* (1984) 162 Cal.App.3d 823, 828–829, 835–838 [209 Cal.Rptr. 16] (*United Steelworkers*); *Turner v. Board of Trustees* (1976) 16 Cal.3d 818, 823–828 [129 Cal.Rptr. 443, 548 P.2d 1115]; *Riggins v. Board of Education* (1956) 144 Cal.App.2d 232, 233–238 [300 P.2d 848]; Code Civ. Proc., § 1094.5.)

Roberts and the CSEA also exercised their right to file a grievance with the District, seeking to arbitrate the dispute under the CBA. With this method of review, the parties select one person from a list provided by the American Arbitration Association (AAA) to serve as "an impartial third party hearing officer." (Ed. Code, § 45113(e); see CBA, § 9.9.4.1.) The arbitrator is bound by the rules of the AAA. (CBA, § 9.9.4.1.) Under section 9.9.4.4 of the CBA, "the decision of the arbitrator . . . shall be final and binding upon the District, the grievant and CSEA," with the exception of the board's statutory authority to review the award under the Arbitration Act, specifically, section 1286.2 of the Code of Civil Procedure (see Ed. Code, § 45113(e)).

As relevant here, the Arbitration Act states that an arbitration award shall be vacated if any of the following applies:

"(1) The award was procured by corruption, fraud or other undue means.

"(2) There was corruption in any of the arbitrators.

"(3) The rights of the party were substantially prejudiced by misconduct of a neutral arbitrator.

"(4) The arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted.

"(5) The rights of the party were substantially prejudiced by the refusal of the arbitrators to postpone the hearing upon sufficient cause being shown therefor or by the refusal of the arbitrators to hear evidence material to the controversy or by other conduct of the arbitrators contrary to the provisions

of this title." (Code Civ. Proc., § 1286.2, subd. (a); see *American Federation of State, County & Municipal Employees v. Metropolitan Water Dist.* (2005) 126 Cal.App.4th 247, 257–259 [24 Cal.Rptr.3d 285] [comparing judicial review of arbitration awards with judicial review of administrative decisions].)

## B. *Validity of the CBA's Arbitration Provisions*

The board relies on *Board of Education v. Round Valley Teachers Assn.* (1996) 13 Cal.4th 269 [52 Cal.Rptr.2d 115, 914 P.2d 193] (*Round Valley*), *San Mateo City School Dist. v. Public Employment Relations Bd.* (1983) 33 Cal.3d 850 [191 Cal.Rptr. 800, 663 P.2d 523] (*San Mateo*), and *United Steelworkers, supra*, 162 Cal.App.3d 823, for the proposition that the CBA's arbitration provisions are partially or totally invalid. Not so.

*Round Valley, supra*, 13 Cal.4th 269, involved a provision in a collective bargaining agreement that (1) required a school district to have "just cause" not to "reelect" a probationary teacher, (2) mandated a statement of reasons for nonreelection, and (3) established a grievance procedure to challenge nonreelection, with a hearing before an arbitrator. Because Education Code section 44929.21, subdivision (b), permitted school districts to decline to reelect probationary teachers without a reason or hearing, the Supreme Court held that the bargaining agreement's provision was in direct conflict with the Education Code and therefore invalid. Accordingly, the trial court had properly vacated an arbitration award enforcing the provision. (*Round Valley, supra*, 13 Cal.4th at pp. 272–274, 281–285, 287–288; cf. *State Personnel Bd. v. Department of Personnel Admin.* (2005) 37 Cal.4th 512, 520–527 [36 Cal.Rptr.3d 142, 123 P.3d 169] [statute authorizing arbitrator to review discipline of *state* employees in accordance with memorandum of understanding is invalid because state Constitution vests State Personnel Board with authority to review disciplinary action].)

In *San Mateo, supra*, 33 Cal.3d 850, decided in 1983, the high court determined whether the Public Employment Relations Board (PERB) was correctly interpreting the Educational Employment Relations Act (EERA) (Gov. Code, §§ 3540–3549.3) as to what subjects could be included in a collective bargaining agreement between a school district and its employees. Although the EERA provided that "[t]he scope of representation shall be limited to matters relating to wages, hours of employment, and other terms and conditions of employment" (Gov. Code, § 3543.2, subd. (a)), the court agreed with PERB that the subjects specifically listed in the statute were not all inclusive in light of the phrase "matters relating to." (*San Mateo, supra*, 33 Cal.3d at pp. 856–860, 862–864.)

The court noted, however, that the EERA precluded a proposed contract clause that would replace, set aside, or annul a provision of the Education Code. (*San Mateo, supra,* 33 Cal.3d at pp. 864–865, citing Gov. Code, § 3540.) As an example of such contract language, the court referred to section 45113 of the Education Code, which "pertain[s] to causes and procedures leading to disciplinary action" (*San Mateo,* at p. 866), saying, "[w]here statutes are mandatory, as are these, a contract proposal which would alter the statutory scheme would be nonnegotiable . . . because [it] would 'replace or set aside' the section of the Education Code" (*ibid.*).

In *United Steelworkers, supra,* 162 Cal.App.3d 823, decided in 1984, the Court of Appeal held that Education Code section 45113—in particular, what is now subdivision (b) of that statute—authorized the governing board to make "conclusive" determinations regarding the discipline of classified employees, thereby rendering invalid a grievance procedure that allowed disciplinary disputes to be resolved through binding arbitration. (See *United Steelworkers, supra,* 162 Cal.App.3d at pp. 833, 840.) The court also interpreted "conclusive" to mean that the governing board's disciplinary decisions were, in essence, unreviewable in the courts. (*Id.* at pp. 835–839.)

█ As enacted in 2001, Education Code section 45113(e) permits classified employees to submit certain disciplinary disputes to arbitration pursuant to the terms of a collective bargaining agreement. (See Stats. 2001, ch. 844, § 3; Stats. 2001, ch. 839, § 1; Amends., Deering's Ann. Ed. Code (2008 supp.) foll. § 45113, p. 296.) That is exactly what was done here. Thus, *United Steelworkers* and *San Mateo* have been abrogated by statute to the extent they interpreted Education Code section 45113(b) as a flat prohibition on the arbitration of disciplinary matters involving classified employees. Whether there is continuing vitality to *United Steelworkers*'s analysis of the "conclusive" nature of board hearings (see Ed. Code, § 45113(b)) is a question not before us. (See *United Steelworkers, supra,* 162 Cal.App.3d 835–839; cf. *Round Valley, supra,* 13 Cal.4th at p. 287; *Turner v. Board of Trustees, supra,* 16 Cal.3d at pp. 823–828; *Riggins v. Board of Education, supra,* 144 Cal.App.2d at pp. 233–238; Code Civ. Proc., § 1094.5.) For present purposes, it is sufficient to say that where, as here, the board reviews an *arbitration* award, judicial review of the board's decision is available to ensure that the board complies with the Arbitration Act (Code Civ. Proc., § 1286.2) and protects the grievant's rights. (See *Round Valley, supra,* 13 Cal.4th at pp. 275–277; Code Civ. Proc., § 1085.)

The parties in this case agreed that if the arbitrator "determines that the nature of the offenses against Mr. Roberts [is] not so serious as to require

bypassing progressive discipline steps, the termination decision cannot stand." The arbitrator so found. In addition, the arbitration award explained that any lesser discipline, such as verbal counseling or warnings, could not be imposed because the deadlines for such discipline, as dictated by the CBA, had expired.

■ The board argues that Education Code section 45113(b) invalidates the provision in the CBA stating that the arbitration award shall be "final and binding," apparently fearing that the provision narrows its review of the award. But nothing in the clear, unambiguous language of Education Code section 45113(b)—which governs *board hearings*—invalidates the CBA's "final and binding" provision, which applies to *arbitration.* And as more than one court has held, if an award is not final and binding, it is *not* an *arbitration* award. (See *Saeta v. Superior Court* (2004) 117 Cal.App.4th 261, 268 [11 Cal.Rptr.3d 610] [citing authorities]; *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9–10 & fn. 4 [10 Cal.Rptr.2d 183, 832 P.2d 899] (*Moncharsh*) [arbitration awards are final and binding even if parties' agreement does not contain express provision to that effect].)

Further, a "final and binding" provision is not inconsistent with the statutory review of an arbitration award to determine if it should be vacated. In nonlabor contracts, that type of provision is common but does not bar judicial review of the award under the Arbitration Act. (See, e.g., *Evans v. Centerstone Development Co.* (2005) 134 Cal.App.4th 151, 156–159 [35 Cal.Rptr.3d 745]; *Oakland-Alameda County Coliseum Authority v. CC Partners* (2002) 101 Cal.App.4th 635, 639, fn. 1, 641 [124 Cal.Rptr.2d 363]; *Delaney v. Dahl* (2002) 99 Cal.App.4th 647, 651, 654–655 [121 Cal.Rptr.2d 663].) And here, Education Code section 45113(e) specifically authorizes the board to review an arbitration award under the statutory standards for vacatur (Code Civ. Proc., § 1286.2).

Nevertheless, the board emphasizes that when Education Code section 45113(e) was enacted, thereby permitting classified employees to submit disciplinary disputes to arbitration, Governor Gray Davis issued a press release stating that the arbitration award would be nonbinding. (See Governor's Press Release No. 142 (Oct. 14, 2001).) And in vetoing an earlier bill on the same subject, which did *not* provide for *any* board review of the arbitration award (Assem. Bill No. 230 (2001–2002 Reg. Sess.) § 1), Governor Davis wrote: "School district governing boards are given the responsibility to determine discipline for their classified employees and are held accountable for their actions. Districts need to retain a wide range of authority in order to fully implement the state's accountability objectives. Responsibilities should not be delegated to an outside arbitrator the local voters can not hold accountable."

(Governor's veto message to Assem. on Assem. Bill No. 230 (July 30, 2001) 2 Assem. J. (2001–2002 Reg. Sess.) p. 3028.)

█ The board relies on this legislative history in arguing that the CBA's "final and binding" provision is invalid and that, as a result, it has broad discretion in reviewing an award under the Arbitration Act (Code Civ. Proc., § 1286.2). But given the universal finality of arbitration awards and the unmistakable language of Education Code section 45113(e), we conclude that the Governor's press release about the 2001 statute and his veto message addressing prior, substantially different legislation do not void the "final and binding" provision. (See *Moncharsh, supra,* 3 Cal.4th at pp. 9–10 & fn. 4.) "In determining [what] the Legislature intended . . . , it is well settled that we must look first to the words of the statute, 'because they generally provide the most reliable indicator of legislative intent.' . . . If the statutory language is clear and unambiguous our inquiry ends. 'If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs.' " (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1103 [56 Cal.Rptr.3d 880, 155 P.3d 284], citation omitted; see *In re Marriage of Stephens* (1984) 156 Cal.App.3d 909, 916–917 [203 Cal.Rptr. 331] [where unambiguous language of statute conflicts with Legislative Counsel's Digest, statutory language controls].) Thus, Education Code section 45113(e) is not a stealth prohibition on final and binding arbitration awards.

Last, the board expresses concern about preserving its right to review disciplinary decisions under the hearing process authorized by Education Code section 45113(b) and its own regulations (see Ed. Code, § 45113(c); Dist. Admin. Regs., § 3). To be specific, the board appears to argue that the sufficiency of cause for discipline *beyond* a letter of reprimand—suspension and termination, as referenced in section 26.3 of the CBA—is not subject to arbitration, binding or otherwise. Based on the facts and procedural history of this case, our holding is necessarily limited to the board's authority to review an arbitration award where the parties' dispute is confined to the "serious" offense exception to progressive discipline, as set forth in section 26.1.1 of the CBA.

█ As we read subdivisions (b) and (e), respectively, of Education Code section 45113, they authorize two distinct methods of challenging disciplinary action, the former under the auspices and regulations of the board, the latter by an arbitrator under the rules of the AAA and the provisions of the CBA. Here, the Education Code and the CBA—to which the District was a signatory—permitted Roberts to pursue both methods, and he did. To sim-

plify the process, the parties agreed to participate in a single proceeding in which Mr. Calister would act as an arbitrator on a preliminary issue and as the board's hearing officer on any subsequent issues. Mr. Calister resolved the preliminary issue in Roberts's favor, effectively ending the proceeding at the arbitration stage. Consequently, the scope of the board's *administrative* authority under Education Code section 45113(b) is not part of this case.

## C. *Confirmation of the Arbitration Award*

The board reviewed the evidence and the arbitration award, concluding that the arbitrator had exceeded his powers under section 1286.2, subdivision (a)(4) of the Code of Civil Procedure. In particular, the board found that the arbitrator had mistakenly interpreted "serious offense" to mean "criminal act."

But that is not even a plausible reading of the arbitration award. Mr. Calister wrote that a "serious offense" consisted of "some act or acts by an employee that are so outrageous and egregious as to *either* have required no prior warning that severe discipline would occur—such as an employee's unprovoked forceful striking of a co-worker or supervisor, stealing District property—*or* some similar outrageous conduct that any employee would or reasonably should know was not only prohibited, but would likely result in summary suspension and termination of . . . employment." (Italics added.) The arbitrator's references to battery and theft are *examples*; they do not constitute the entirety of his reasoning. And the sentence is written in an "either/or" format, such that the examples appear in the *first* part of the sentence.

The arbitrator's interpretation of the CBA is reminiscent of the language in *Cranston v. City of Richmond* (1985) 40 Cal.3d 755 [221 Cal.Rptr. 779, 710 P.2d 845], where the Supreme Court decided what kind of misconduct a reasonable police officer would know was grounds for discipline or discharge regardless of whether it was proscribed by a rule. (See *id.* at pp. 769–770.) The court commented: "The analysis we follow here is consistent with the principles commonly applied by labor arbitrators in determining the propriety of discipline under the standard of 'just cause.' 'A fundamental component of the just-cause standard is that employees must be told what kind of conduct will lead to discipline—especially if the penalty is to be discharge. An employee can hardly be expected to abide by "the rules of the game" if the employer has not communicated those rules, and it is unrealistic to think that, after the fact, an arbitrator will uphold a penalty for conduct that an employee did not know was prohibited.' . . . *Arbitrators recognize*, however, that · ' "certain *egregious conduct, such as stealing, intoxication while at work, or fighting with supervisors or coworkers*, is so evidently a violation of commonly accepted notions of work conduct that it will be presumed that *the*

*employee is on notice that such conduct is unacceptable* and that he can be penalized for violating such rules." ' " (*Id.* at p. 770, fn. 13, citation omitted, italics added.)

Here, the board also overlooked that the arbitrator found a lack of evidence to support many of the charges against Roberts, thus reducing the gravity of whatever he may have done. For instance, the charge that he threatened coworkers with violence, possibly with the use of a gun, would arguably constitute a serious offense under the *arbitrator's definition*, but the arbitrator found no evidence to sustain that charge. Rather, he determined that other employees had "<u>unreasonably</u> conclude[d] that Roberts was literally ready to explode with violence against them."

The arbitrator also considered past practices—how the District had responded to behavior by *other* employees in Roberts's department. He found that the use of rude, obscene, vulgar, profane, and sexually explicit language was "rampant," such that management had to be aware of it, but did nothing to stop it. Pranks were also a frequent occurrence, committed with either the participation or knowledge of management.

And the arbitrator's task was not to define "serious" in the abstract, as someone might do with a dictionary, or to decide whether particular conduct could be labeled "serious." Rather, the arbitrator had to determine whether Roberts's conduct was *so* serious *that progressive discipline was not warranted.* The arbitrator considered, among other things, the effectiveness of progressive discipline as well as the range of workplace behavior tolerated by management. In accomplishing his task, the arbitrator applied "generally accepted rules for contract construction," as required by section 9.9.4.3 of the CBA. (See, e.g., Civ. Code, § 1635 et seq.; 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, §§ 741–746, 748–750, pp. 827–835, 836–841.)

Finally, it deserves mention that this case involves not a commercial contract or an individual employment contract, but a collective bargaining agreement. Such an agreement "is an effort to erect a system of industrial self-government. . . . The mature labor agreement may attempt to regulate all aspects of the complicated relationship, from the most crucial to the most minute over an extended period of time. Because of the compulsion to reach agreement and the breadth of the matters covered, as well as the need for a fairly concise and readable instrument, the product of negotiations (the written document) is . . . 'a compilation of diverse provisions: some provide objective criteria almost automatically applicable; some provide more or less specific standards which require reason and judgment in their application; and

some do little more than leave problems to future consideration with an expression of hope and good faith.' . . . Many of the specific practices which underlie the agreement may be unknown, except in hazy form, even to the negotiators. . . . [T]he grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government. Arbitration is the means of solving the unforeseeable by molding a system of private law for all the problems which may arise and to provide for their solution in a way which will generally accord with the variant needs and desires of the parties. The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement." (*Steelworkers v. Warrior & Gulf Co.* (1960) 363 U.S. 574, 580–581 [4 L.Ed.2d 1409, 80 S.Ct. 1347, 1351–1352], citation omitted.)

██ " 'The labor arbitrator is usually chosen because of the parties confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment. . . . The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed.' . . . [¶] Indeed, it is because of his special experience, expertise, and selection by the parties that courts generally defer to an arbitrator's interpretation of the collective-bargaining agreement: [¶] '[T]he question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.' " (*Nolde Bros., Inc. v. Bakery Workers* (1977) 430 U.S. 243, 253–254 [51 L.Ed.2d 300, 97 S.Ct. 1067, 1073], citation omitted.)

For the foregoing reasons, we reject the board's position that, under the arbitration award, its use of summary suspension and termination is limited to the criminal conduct of its employees. Consequently, we do not decide whether such an interpretation would exceed the arbitrator's powers. Instead, we are presented with the situation in which the losing party to an arbitration disagrees with the arbitrator's analysis and the end result.

In reviewing an arbitration award, the board is required to apply the same standards as the courts. (See Ed. Code, § 45113(e), citing Code Civ. Proc., § 1286.2.) As explained by our Supreme Court: "[I]t is the general rule [in arbitration proceedings] that, 'The merits of the controversy between the parties are not subject to judicial review.' . . . More specifically, courts will not review the validity of the arbitrator's reasoning. . . . Further, a court may

not review the sufficiency of the evidence supporting an arbitrator's award. . . .

". . . [W]ith narrow exceptions, an arbitrator's decision cannot be reviewed for errors of fact or law. In reaffirming this general rule, we recognize there is a risk that the arbitrator will make a mistake. That risk, however, is acceptable for two reasons. First, by voluntarily submitting to arbitration, the parties have agreed to bear that risk in return for a quick, inexpensive, and conclusive resolution to their dispute. . . . '[T]he parties to an arbitral agreement knowingly take the risks of error of fact or law committed by the arbitrators and that this is a worthy "trade-off" in order to obtain speedy decisions by experts in the field whose practical experience and worldly reasoning will be accepted as correct by other experts.' . . . 'In other words, it is within the power of the arbitrator to make a mistake either legally or factually. When parties opt for the forum of arbitration they agree to be bound by the decision of that forum knowing that arbitrators, like judges, are fallible.' . . . [¶] . . . [¶]

"A second reason why we tolerate the risk of an erroneous decision is because the Legislature has reduced the risk to the parties of such a decision by providing for judicial review in circumstances involving serious problems with the award itself, or with the fairness of the arbitration process. . . . [P]rivate arbitration proceedings are governed by title 9 of the Code of Civil Procedure, sections 1280–1294.2. Section 1286.2 sets forth the grounds for vacation of an arbitrator's award." (*Moncharsh*, *supra*, 3 Cal.4th at pp. 11–12, citations omitted.)

"In light of the development of decisional law embracing as exclusive the statutory grounds to vacate an arbitration award, as well as the apparent intent of the Legislature to generally exclude nonstatutory grounds to vacate an award, we adhere to the . . . line of cases that limit judicial review of private arbitration awards to those cases in which there exists a statutory ground to vacate or correct the award. Those decisions permitting review of an award where an error of law appears on the face of the award causing substantial injustice have perpetuated a point of view that is inconsistent with the modern view of private arbitration and are therefore disapproved. [¶] . . . [¶] . . . It is well settled that 'arbitrators do not exceed their powers merely because they assign an erroneous reason for their decision.' . . . A contrary holding would permit the exception to swallow the rule of limited judicial review; a litigant could always contend the arbitrator erred and thus exceeded his powers. To the extent [appellant] argues his case comes within section 1286.2, subdivision [(a)(4)] merely because the arbitrator reached an errone-

ous decision, we reject the point." (*Moncharsh, supra,* 3 Cal.4th at pp. 27–28, citations omitted.)

All of these principles apply even where, as here, the arbitration agreement (CBA) contains language to the effect that the arbitrator does not have the " 'power to alter, amend, modify or change any of the terms of this agreement.' " (*Moncharsh, supra,* 3 Cal.4th at p. 7, fn. 1.) As the board acknowledges, the CBA contained no definition of "serious" as used in "serious nature of the offense" or elsewhere. That task fell to the arbitrator. And, as we have discussed, in defining "serious," he did not run afoul of any other term of the agreement.

■ Under the statute requiring vacatur of an arbitration award where the arbitrators exceed their powers (Code Civ. Proc., § 1286.2, subd. (a)(4)), "the [governing board] is authorized to vacate an arbitrator's determination that he or she has the jurisdiction to resolve an issue when [that] issue is outside the scope of an arbitration agreement, or the statutes permitting or requiring arbitration." (*Glassman v. McNab* (2003) 112 Cal.App.4th 1593, 1598 [6 Cal.Rptr.3d 293]; see also *Jordan v. Department of Motor Vehicles* (2002) 100 Cal.App.4th 431, 443 [123 Cal.Rptr.2d 122] [listing circumstances in which arbitrators exceed their powers].) And, in determining whether an arbitrator has exceeded his or her powers, the board " 'must give substantial deference to the arbitrator's own assessment of his contractual authority.' " (*Glassman,* at p. 1601; see *Jordan,* at pp. 443–444.) To illustrate, an arbitrator exceeds his powers by extending the life of a collective bargaining agreement beyond the termination date specified in the agreement and permitted by federal law. (See *Flores v. Barman* (1955) 130 Cal.App.2d 282, 287–291 [279 P.2d 81].)

Because the board did not properly apply "the standards set forth in Section 1286.2 of the Code of Civil Procedure" (Ed. Code, § 45113(e)), Roberts's statutory rights were violated, and the trial court had the authority to review and confirm the arbitration award. (See *Round Valley, supra,* 13 Cal.4th at pp. 275–277.)

■ In sum, the board did not establish a basis in the trial court for vacating the arbitration award, and the trial court correctly granted the petition to confirm. (See Code Civ. Proc., § 1286; *Eternity Investments, Inc. v. Brown* (2007) 151 Cal.App.4th 739, 745, 746 [60 Cal.Rptr.3d 134].) The writ of mandate was appropriate to ensure that the board reversed its decision and reinstated Roberts with backpay and benefits in accordance with his rights under the CBA. (See Code Civ. Proc., § 1085, subd. (a); *American Federation of State, County & Municipal Employees v. Metropolitan Water Dist., supra,* 126 Cal.App.4th at pp. 261–262.)

## III

## DISPOSITION

The judgment is affirmed.

Vogel, J., and Rothschild, J., concurred.