Filed 3/8/22  P. v. Dougherty CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C093246 |
| Plaintiff and Respondent, | (Super. Ct. No. 18FE000503) |
| v. | |
| TONY RAY DOUGHERTY, | |
| Defendant and Appellant. | |

Defendant Tony Ray Dougherty was found guilty of two counts of forcible rape of one of his stepdaughters, and with committing lewd and lascivious acts on another stepdaughter.  The court sentenced him to an indeterminate term of 225 years to life in state prison, plus a determinate term of 15 years.

On appeal, defendant contends that the trial court erred by permitting expert testimony on child sexual abuse accommodation syndrome (CSAAS).  He argues the

1

testimony should have been subjected to *Kelly/Frye* scrutiny,[1] and that admitting it without a *Kelly/Frye* hearing violated his constitutional rights to due process and a fair trial.  Even if a *Kelly/Frye* hearing was not required, defendant asserts the trial court abused its discretion because the expert essentially vouched for the victims' testimony.

We conclude the trial court properly admitted the CSAAS evidence without subjecting the expert's testimony to *Kelly/Frye* scrutiny.  We shall affirm the judgment.

BACKGROUND

M. and her younger sister, S.,[2] had an unstable and difficult childhood.[3]  They originally lived with both their mother, Mo., and their father, T., in Sacramento.  Their father, however, was often in jail, and domestic violence plagued their parents' relationship.

When M. was about six years old and S. was about five years old, their parents separated.  M. and S. lived with Mo. and a couple of her subsequent boyfriends.  Around April 2009, Mo. sent M. and S. to live with their paternal grandmother in Indiana.  Although they were only supposed to visit for the summer, Mo. left the girls there without explanation.  They lived with their grandmother in Indiana for about five years with little to no contact with either their mother or their father.  M. was upset that she never heard from her mother because she "just wanted a normal family"; she did not think her mother wanted them.

---

[1]  *People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013.

[2]  M. was born in March 2001 and S. was born in September 2002.

[3]  They also had an older brother, A.

When M. was about 12 years old, her father was released from jail and moved to Indiana with his new wife. M. and S. went to live with him and his wife. He had a "bad temper" and "anger issues," and would often physically and emotionally abuse his wife.

After living with their father and stepmother for about two years, father was arrested again and stepmother contacted M. and S.'s mother to pick them up. In the fall of 2015, Mo. and her new husband, defendant,[4] drove to Indiana to bring M. and S. back to live in an apartment in Sacramento. At the time, M. was 14 years old and S. was 13 years old.

Although Mo. and defendant were married and had two children together—two-year-old J. and three-year-old E.—defendant was prohibited from living with them in the apartment because he was a registered sex offender after being convicted of molesting his former stepdaughter when she was about six years old.[5] Defendant therefore maintained a separate room at the Sequoia Hotel, where he also worked.

Defendant supported the family monetarily, paying for school clothes, shoes, and food as well as Mo.'s bills. He also helped M. purchase an Xbox Two. While M. began to accept and care for defendant as her stepfather, S. and defendant were not close. M. and S.'s relationship with their mother was often strained and fraught with arguments, which sometimes turned physical.

In 2015, a few months after moving back to Sacramento, defendant began paying M. to help him set up his DJ equipment at various events; she used the money to purchase clothes and other personal items. One night in November 2015, when M. was 14 years old, she and defendant went to his room at the Sequoia Hotel to retrieve some of his DJ equipment. Once inside the room, defendant locked the door and sat beside her on his

---

[4]     M., S., and Mo. all referred to defendant as "Liam."

[5]     Another child, a newborn named Ma., whom defendant recently had fathered with another woman, was also sometimes at Mo.'s apartment.

bed. Defendant caressed her leg and arms, and M. told him to "knock it off." Defendant pushed her shoulder down so she was laying on the bed. M. sat up and defendant pushed her back down again. M. again told defendant to stop, and he responded that "[i]t [would] only hurt for a second." Defendant laid on top of her, spread her legs with his knees, and held her arms above her head. M. was scared and did not know what to say. She was unsure why she did not scream, although she again told defendant to stop. According to M., she "froze."

Defendant pulled M.'s shorts and underwear down, kissed her and fondled her breasts, and had sexual intercourse with her, which "hurt and . . . stung." He then sat up and ejaculated. Afterwards, he told M. not to tell anyone or else he would hurt her. Defendant also told M. that because he paid the bills, if he went to jail, her family would be homeless, and she believed him.

In the following months, defendant would whisper "weird" things to M. if they were alone, such as, "Hey, sexy." He eventually stopped whispering to her when she avoided him and kept to herself. A couple of months later, M. thought defendant had changed his behavior so she resumed working for him; she hoped he would not try to have sex with her again as she just wanted to have a "normal family relationship with him."

Despite what happened in defendant's room at the Sequoia Hotel, M. sometimes went there as a reprieve from her mother's apartment and her siblings. Defendant would not be present in the room as he was working downstairs.

In May 2016, M. went to defendant's room to play on the computer by herself. Defendant got off work early, returned to his room, and started giving M. a backrub. Although M. did not believe defendant would try to engage in any sexual contact again, he eventually touched her bottom, pulled her pants down, and had sexual intercourse with her for a second time. Afterwards, she felt "stupid" for having allowed defendant to

4

touch her again after he sexually assaulted her the first time. She did not immediately tell anyone about what defendant had done.

About a year later, in June 2017, M. disclosed the sexual abuse to her sister, S. Although S. encouraged M. to tell their mother, grandmother, or the police, M. did not report the abuse because she thought no one would believe her and nothing would be done.

S. then told M. that defendant had touched her as well. According to S., she had gotten suspended from school and was at home alone with defendant and her younger half siblings. After putting the children to bed, defendant sat beside her on the couch, put his legs over her legs to restrict her movements, grabbed her arms to hold them down, and then touched her stomach under her shirt and tried to touch her buttocks. S. repeatedly told him to stop and that she did not like what he was doing. She tried to push him off and eventually bit him on the shoulder so he would stop. She got up, kicked him in the testicles, and left the house. She then ran back to her school, but did not tell anyone what happened. She did not tell her mother because she did not think her mother would believe her.

S. eventually told her godmother, who told her to tell her mother. S. did tell her mother, but her mother did not believe her and did not call the police. S. also told her close friend N., whose grandmother lived in the same apartment complex as S. and M.[6] N.'s aunt called police to report the abuse.

While police interviewed M. on June 20, 2017, M.'s mother was standing nearby and interjected that she believed M. because M. was her daughter. M.'s mother later told her that when she confronted defendant about M.'s allegations, he tried to commit suicide

---

[6]     N. testified that defendant would sometimes give her prolonged hugs and try to touch her buttocks, which made her uncomfortable. She did not feel comfortable telling anyone about the hugs.

by slitting his forearm multiple times. About a week after M. spoke with police, Mo. dropped M. and S. off at the Children's Receiving Home without telling them she was leaving them there. M. and S. moved back to Indiana with their paternal grandmother a couple of weeks later.

Defendant was arrested and charged with two counts of forcible rape (Pen. Code, § 261, subd. (a)(2)—counts one & two)[7] against M. (at age 14 and 15 years old), and one count of committing lewd and lascivious acts upon a child under the age of 14 years old (§ 288, subd. (a)—count three) against S. It was further alleged that defendant had two prior section 288, subdivision (a) convictions, which qualified as prior strikes (§§ 667, subd. (e)(2), 1170.12, subd. (c)(2)), and prior serious felony convictions (§ 667, subd. (a)). Based on one of the prior convictions, it was also alleged for all counts that defendant was a habitual sex offender (§ 667.71).

At trial, M. and S. testified to the facts recited above. Over defendant's pretrial objection based on *Kelly/Frye*, the prosecution called psychologist Dr. Blake Carmichael, an expert on sexual abuse of children, to testify about CSAAS. Dr. Carmichael did not know M. or S. and was not familiar with the facts of the case.

Dr. Carmichael testified that children delay reporting sexual abuse for a variety of reasons, including that the child trusts and loves the abuser or relies on the abuser for care, that the child still values the relationship and is reluctant to see it end, that the child often feels powerless and helpless because the abuser is an older, more dominant person, and that the child fears retribution, especially if the abuser acts violently towards other family members. Dr. Carmichael also testified that sexually abused children will delay reporting abuse if they think no one will believe them, and that they sometimes retract a

---

**7**     Undesignated statutory references are to the Penal Code.

6

valid claim of abuse after disclosing. During cross-examination, Dr. Carmichael acknowledged that false allegations of sexual abuse sometimes do occur.

Mo. testified on defendant's behalf. According to her, the girls and their brother were being bullied at school so their paternal grandmother offered to care for them in Indiana for the summer, and then the grandmother "angled" to make them stay without her knowledge. Mo. initially called them all the time, "like every week," but contact became more infrequent after a year. In 2015, she and defendant went to Indiana and brought them back to Sacramento. By Christmas 2015, M. and S. were struggling in school and fighting with each other and with her at home. Mo. claimed M. and S. bullied her younger children, E. and J., and even defendant's infant daughter Ma.

Mo. admitted that she did not know how to raise teenagers, and that she fought with M. and S. almost every day. Both M. and S. had punched Mo. in the face during separate arguments. By March 2016, the girls' behavior was so bad that Mo. told them if they kept it up she would send them back to Indiana. She testified she took M. and S. to the Children's Receiving Home in June 2017 because she feared for her life and she was afraid of losing her apartment, given the girls' unruly behavior.

At the time of trial, Mo. was still married to defendant and visited him in jail as often as she could. She admitted that when S. told her defendant had sexually assaulted her and M., she told defendant immediately rather than reporting it to police or Child Protective Services. She also took him to buy "blades" and then dropped him off down by the river. She denied that she would ever lie for him, but said she did not "support" what her daughters disclosed and instead supported her husband because she did not know her girls very well and she did not trust them.

In November 2020, a jury found defendant guilty on all counts and found all prior allegations true. Defendant was sentenced to 225 years to life plus 15 years as follows: consecutive terms of 25 years to life on each of the three counts due to the habitual sex

7

offender enhancement, tripled to 75 years to life under the Three Strikes law, plus five years on each of the prior serious felonies.  Defendant timely appealed.

DISCUSSION

I

Kelly/Frye *and CSAAS Evidence*

Defendant contends the trial court violated his federal and state rights to due process and a fair trial when it allowed Dr. Carmichael to testify as an expert on CSAAS. He characterizes such evidence as "junk science" that has no probative value, and argues the trial court should have subjected Dr. Carmichael's testimony to *Kelly/Frye* scrutiny because CSAAS's reliability is no longer generally accepted in the scientific community. We are not persuaded.

*Kelly/Frye* "renders inadmissible evidence derived from a 'new scientific technique' unless the proponent shows [among other things] that . . . 'the technique is generally accepted as reliable in the relevant scientific community.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 315.)  " '*Kelly/Frye* only applies to that limited class of expert testimony which is based, in whole or in part, on a technique, process, or theory which is *new* to science and, even more so, the law.' " (*Jackson, supra*, at p. 316, original italics.)

California courts have uniformly held that CSAAS testimony is not subject to *Kelly/Frye* because it does not qualify as "scientific evidence" so long as it is not used to prove the victim was in fact sexually abused.  (See, e.g., *People v. Lapenias* (2021) 67 Cal.App.5th 162, 173 [finding *Kelly/Frye* did not apply to CSAAS because it was not "new" and because it did not purport to provide a definitive truth, but rather was intended to disabuse jurors of misconceptions they might hold about the conduct of children who have been sexually abused; "expert CSAAS testimony is not ' " 'scientific evidence' " ' "]; *People v. Munch* (2020) 52 Cal.App.5th 464, 472-473 [CSAAS evidence is not subject to *Kelly/Frye* because it is not new scientific evidence that has not previously been accepted in court]; *People v. Wells* (2004) 118 Cal.App.4th 179, 188;

8

*People v. Harlan* (1990) 222 Cal.App.3d 439, 448; *People v. Gray* (1986) 187 Cal.App.3d 213, 218-219.)

Citing cases from other states,[8] however, defendant argues that CSAAS should be held inadmissible in California because it is no longer accepted in the scientific community and the average person no longer harbors misconceptions about child sexual abuse victims. While he acknowledges that the California Supreme Court has approved of admitting CSAAS evidence to dispel misconceptions about sexually abused children, he nevertheless argues the approval was dictum and that neither case considered whether CSAAS satisfied *Kelly/Frye*.

But even if our Supreme Court has not directly addressed the applicability of *Kelly/Frye* to CSAAS evidence, as noted above, several of our sister courts have. We see no reason to depart from the uniform conclusion reached in those cases that *Kelly/Frye* does not apply to CSAAS evidence.

And, in California, "it has long been held that in a judicial proceeding presenting the question whether a child has been sexually molested, CSAAS is admissible evidence for the limited purpose of disabusing the fact finder of common misconceptions it might have about how child victims react to sexual abuse." (*In re S.C.* (2006) 138 Cal.App.4th 396, 418; *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1069; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744; *People v. Housley* (1992) 6 Cal.App.4th 947, 955-956; *People v. Bowker* (1988) 203 Cal.App.3d 385, 393-394.) Although expert testimony about how child sexual abuse victims commonly react is not admissible to show a child has in fact been sexually abused, it is admissible to show the alleged victim's conduct was not inconsistent with the conduct of someone who has been molested, and also to

---

[8] See, e.g., *State v. J.L.G.* (N.J. 2018) 234 N.J. 265 and *King v. Commonwealth* (Ky. 2015) 472 S.W.3d 523, 529.

9

evaluate the believability of the alleged victim's testimony. (*Patino, supra*, 26 Cal.App.4th at pp. 1744-1745.)

In *People v. McAlpin* (1991) 53 Cal.3d 1289 and *People v. Brown* (2004) 33 Cal.4th 892, our Supreme Court discussed with approval admitting CSAAS evidence to " 'disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*McAlpin, supra*, at p. 1301; *Brown, supra*, at p. 906.) *McAlpin* explained the admissibility of evidence about the behavior of child sexual abuse victims to support its conclusion that the trial court properly admitted testimony on why a *parent* might delay reporting sexual abuse of his or her child. (*McAlpin*, at pp. 1300-1301.) *Brown* analogized to CSAAS evidence in holding the trial court properly admitted expert testimony on battered women's syndrome even though there was no proof the defendant abused the victim on more than one occasion. (*Brown*, at pp. 895-896, 899-900.)

Although neither *McAlpin* nor *Brown* involved a child that failed to report sexual abuse or otherwise denied or recanted sexual abuse accusations, we consider the discussions by our Supreme Court on the admissibility of CSAAS evidence in each case persuasive authority which supports the trial court's ruling permitting such evidence here. (*United Steelworkers of America v. Board of Education* (1984) 162 Cal.App.3d 823, 835 ["Even if properly characterized as dictum, statements of the Supreme Court should be considered persuasive"], superseded by statute on another ground as stated in *California School Employees Assn. v. Bonita Unified School Dist.* (2008) 163 Cal.App.4th 387, 401; *San Joaquin etc. Irr. Co. v. County of Stanislaus* (1908) 155 Cal. 21, 28 ["it does not follow that the dictum of a court is always and at all times to be discarded. A correct principle of law may be announced in a given case, although it may not be necessary to there apply it"].) That other jurisdictions have resolved the issue differently also does not compel a contrary result. (*People v. Williams* (1997) 16 Cal.4th 153, 195 [case from a sister state is not controlling].)

Here, Dr. Carmichael's testimony was relevant to help explain why M. and S. did not initially tell anyone about the sexual abuse and delayed reporting it for over a year. He testified that sexually abused children may delay reporting when they think no one will believe them. This helped explain why both M. and S. did not reveal the abuse to their mother or anyone else as they did not think that they would be believed.

Dr. Carmichael's testimony also was relevant to help explain that children often care about their abusers despite the sexual abuse, as M. did here; she testified that she wanted to have a "normal family relationship" with defendant and that he often bought her things. The doctor also testified that it was common for a child to delay reporting sexual abuse if the child relies on the abuser for care, as M. and S. did since defendant provided for the family, bought groceries and other goods, and paid their mother's bills.

Dr. Carmichael explained that people often mistakenly believe that children will fight off their abusers or immediately report the abuse to stop it. Such testimony helped the jury to understand why M. "froze" when defendant twice had sex with her, while S. fought back when defendant fondled her.

Dr. Carmichael's testimony that a child may still value the relationship with his or her abuser, as the sexual abuse is only one aspect of the relationship, helped explain why M. would still want to be around defendant after the first time he raped her at the Sequoia Hotel. It dispelled the misconception that children uniformly try to avoid their abusers, especially since the perpetrator may still have some redeeming qualities. M. liked working for defendant because she earned money to buy personal items, and she also enjoyed going to defendant's hotel room to play video games and get a respite from her mother's crowded apartment. She also viewed defendant as her stepfather and she wanted to have a "normal family relationship" with him even if he was not her biological father.

The fact that the public might be more aware that sexual abuse occurs does not mean there are no longer misconceptions about child sexual molestation. Dr.

11

Carmichael's testimony was relevant to explain these faulty assumptions concerning how and when a victim of sexual abuse may come forward about the abuse, and that the failure to immediately report abuse is not inconsistent with someone who suffered sexual abuse. The trial court did not violate defendant's constitutional right to due process by admitting the CSAAS evidence without first finding it admissible pursuant to *Kelly/Frye*.

II

*Abuse of Discretion*

Defendant next attempts to reframe his constitutional argument as an abuse of discretion. He again argues the trial court abused its discretion by admitting the CSAAS evidence without first subjecting it to a *Kelly/Frye* analysis, and that the CSAAS evidence improperly vouched for the testimony of M. and S. We disagree.

Although Dr. Carmichael's testimony addressed misconceptions regarding sexual abuse victims that were relevant to the facts of this case, he in no way vouched for M. and S. or otherwise suggested that the jury should find defendant guilty. Indeed, the trial court properly instructed the jury with CALCRIM No. 1193, which informed them that Dr. Carmichael's testimony was not evidence that defendant committed any of the charged crimes, and that it could only consider his testimony when deciding whether M. and S.'s conduct was not inconsistent with the conduct of someone who has been sexually abused and in evaluating the believability of their testimony. Dr. Carmichael testified that he did not know M. or S. and knew nothing about the case. He expressed no opinion on whether defendant sexually abused M. or S. The jury was not compelled to accept Dr. Carmichael's testimony or conclude that the delays in reporting here were due to CSAAS rather than fabrication.

12

DISPOSITION

The judgment is affirmed.


       KRAUSE       , J.


We concur:


       RAYE       , P. J.


       HULL       , J.